10-2155-cv

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term 2010

Submitted: January 12, 2011          Decided: February 3, 2011

Docket No. 10-2155-cv

————————————

FISCHER & MANDELL LLP,

*Plaintiff-Appellant,*

v.

CITIBANK, N.A.,

*Defendant-Appellee.*

————————————

Before:    POOLER, WESLEY, and CHIN, *Circuit Judges.*

Appeal from a judgment of the United States District Court for the Southern District of New York (Sullivan, *J.*) dismissing plaintiff-appellant's claims against defendant-appellee bank for breach of contract and negligence. Plaintiff-appellant contended that the bank was responsible for the loss of funds when the bank executed wire transfers against insufficient funds. The district court rejected the claims and granted summary judgment to the bank.

AFFIRMED.

BARRY R. FISCHER, The Barry Fischer Law Firm LLC, New York, NY, *for Plaintiff-Appellant*.

BARRY J. GLICKMAN, Zeichner Ellman & Krause LLP, New York, NY, *for Defendant-Appellee*.

CHIN, *Circuit Judge*:

In January 2009, *pro se* plaintiff-appellant Fischer & Mandell LLP ("F&M"), a law firm, deposited a check for $225,351 into its account at defendant-appellee Citibank, N.A. ("Citibank"). The funds were made "available" before the check cleared, and F&M wired most of the funds elsewhere. The check, however, turned out to be counterfeit and was dishonored. Citibank debited the account the amount of the check plus a $10 returned check fee.

F&M brought this action below for breach of contract and negligence, contending that it relied on Citibank's advice that the funds were "available" and that Citibank was responsible for the losses. In a thorough and carefully considered decision, the district court (Sullivan, *J.*) granted summary judgment to Citibank dismissing the claims. We affirm.

## STATEMENT OF THE CASE

### A. Facts

In January 2009, F&M[1] received from a new client what appeared to be an official Wachovia Bank check for $225,351 (the "Check"). The Check was made payable to F&M, and F&M was advised that it represented partial payment of a debt owed by another entity to the client. On Thursday, January 15, 2009, F&M deposited the Check into its attorney trust account at Citibank.

The client requested a wire transfer of a portion of the funds. On Monday, January 19, 2009, a bank holiday, F&M accessed its trust account through the Citibank website. The website showed that funds in excess of the amount of the Check were "available." As instructed by its client, F&M then requested a wire transfer of $182,780 to an account in South Korea. Citibank executed the transfer the next day.

The client thereafter requested a second wire transfer. On Wednesday, January 21, 2009, F&M again accessed its trust account online and saw an "available" balance of $61,232. F&M then requested transfer of $27,895 to an account in Canada. Because Citibank did not have a direct relationship with the

_____

[1] F&M is now known as the Barry Fischer Law Firm LLC.

Canadian bank, it sent a payment order to an intermediary bank, Bank of America, N.A. ("BoA"), at 9:37 a.m. the same day.[2]

That afternoon, the Federal Reserve Bank returned the Check as dishonored and unpaid. A Citibank representative telephoned F&M to advise that the Check was counterfeit and had been dishonored. Citibank charged back to the trust account the amount of the Check and a $10 returned check fee, resulting in an overdraft. Citibank then debited an amount necessary to satisfy the overdraft from a money market account F&M maintained at Citibank.

The same afternoon, at approximately 3:30 p.m., F&M asked Citibank to cancel and recall the two wire transfers. Citibank did not, however, seek to cancel the wire transfers until shortly after 6 a.m. the next morning. On January 27 and 28, 2009, Citibank learned that the transfers could not be cancelled because the funds had already been withdrawn.

F&M's accounts at Citibank were covered by a series of written agreements (the "Agreements"), the most relevant of which

-----

[2]     Intermediary banks are a common feature of international electronic funds transfers, the operations of which we explained recently in *Shipping Corp. of India Ltd. v. Jaldhi Overseas PTE Ltd.*, 585 F.3d 58, 60 n.1 (2d Cir. 2009).

-4-

were the CitiBusiness Client Manual (the "Manual"), the Citibank Marketplace Addendum (the "Addendum"), and the CitiBusiness User Agreement (the "User Agreement," and collectively the "Agreements").

B.  *Prior Proceedings*

F&M commenced two lawsuits based on Citibank's actions with respect to the Check.

On February 2, 2009, F&M brought an action in the Southern District of New York asserting claims under the Electronic Fund Transfer Act and the Expedited Funds Availability Act and state law.  The district court (Sullivan, *J.*) granted summary judgment to Citibank dismissing the federal claims and declining to exercise supplemental jurisdiction over the state law claims.  *See Fischer & Mandell, LLP v. Citibank, N.A.*, No. 09 Civ. 1160 (RJS), 2009 WL 1767621 (S.D.N.Y. June 22, 2009).  F&M did not appeal the judgment.

On July 14, 2009, F&M commenced this action in the Supreme Court of the State of New York on the state law claims. The complaint asserted two causes of action:  breach of contract and negligence.  The claims were brought under the common law of New York; the complaint did not cite the Uniform Commercial Code

-5-

(the "U.C.C."). Citibank removed the case to the Southern District of New York based on diversity jurisdiction.[3]

Citibank moved for summary judgment, and the district court (Sullivan, *J.*) granted the motion in May 2010. *See Fischer & Mandell, LLP v. Citibank, N.A.*, No. 09 Civ. 6916 (RJS), 2010 WL 2484205 (S.D.N.Y. May 27, 2010). The district court rejected Citibank's assertion that the breach of contract claim was preempted by Articles 4 and 4-A of the U.C.C. because, as the district court observed, both of those articles allow certain of their provisions to be varied by agreement between the parties. The learned district court considered the Agreements, concluded that they were clear and unambiguous, and held as a matter of law that Citibank did not breach its contractual obligations to F&M. *Id.* at **4-6.

As for the negligence claim, the district court held that the claim was preempted by Article 4-A of the U.C.C. *Id.* at **7-8. The district court applied Article 4-A, concluded that

---

[3] Citibank is a citizen of Nevada and F&M is a citizen of New York for diversity purposes. Apparently, the parties were unaware of their diverse citizenship in the first action, as there is no reason why they could not have invoked diversity jurisdiction over the state law claims then.

Citibank acted in conformity with Article 4-A, and held that the negligence claim failed as a matter of law. *Id.* at *9.

Final judgment granting Citibank's motion for summary judgment was entered on May 28, 2010, and this appeal followed.

## DISCUSSION

### A. *Standard of Review*

We review an award of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party. *J. Walter Thompson, U.S.A., Inc. v. First BankAmericano*, 518 F.3d 128, 136-37 (2d Cir. 2008).

### B. *The Merits*

We discuss the two causes of action -- breach of contract and negligence -- in turn.

#### 1. *Breach of Contract*

##### a. *U.C.C. Preemption*

A threshold issue is whether Articles 4 and 4-A preempt F&M's breach of contract claim, brought under the common law of New York. If so, the question remains to what extent. The district court held that the breach of contract claim was not preempted in this case because both Articles permit parties in a banking relationship to vary their rights by agreement, to a certain extent, and the relevant contractual provisions here were

-7-

not inconsistent with the rights created by the U.C.C.  We agree.[4]

Article 4-A "governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers."  *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998); *accord Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 87-88 (2d Cir. 2010).  In *Grain Traders*, we held that common law claims arising from electronic funds transfers are precluded "when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A."  160 F.3d at 103 (citations omitted). We noted, however, that Article 4-A permits some of its provisions to be varied by agreement.  *Id.*  For example, § 4-A-212 permits a receiving bank to vary its duties to the sender of wire transfers.  *See* N.Y. U.C.C. § 4-A-212 ("A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts . . . and the bank owes no duty to any party to the funds transfer except as provided in [Article 4-A] or *by express agreement.*" (emphasis added)).  Accordingly, a common law breach

---

[4]     Although Citibank no longer argues, as it did below, that the breach of contract claim is preempted, F&M continues to suggest that the Agreements are inconsistent with the U.C.C.  We address preemption to resolve this dispute.

-8-

of contract claim is not preempted by Article 4-A to the extent the provisions are not inconsistent with Article 4-A or they fall within one of the areas where a variance is permitted. *See Centre-Point Merch. Bank Ltd. v. Am. Express Bank Ltd.*, 913 F. Supp. 202, 206 (S.D.N.Y. 1996) ("[R]esorting to principles of law or equity outside of Article 4-A is acceptable, so long as it does not create rights, duties and liabilities 'inconsistent with those stated in [Article 4-A].'" (quoting N.Y. U.C.C. § 4-A-102 cmt.)); *Sheerbonnet, Ltd. v. Am. Express Bank, Ltd.*, 951 F. Supp. 403, 414 (S.D.N.Y. 1995) (denying motion to dismiss common law tort and equity claims where they did "not conflict with any of Article 4-A's provisions"); *see also Ma v. Merrill Lynch*, 597 F.3d at 89 (observing that "[n]ot all common law claims are per se inconsistent with [the Article 4-A] regime").

Article 4 governs bank deposits and collections. Neither the New York Court of Appeals nor our Court has directly considered whether or to what extent Article 4 preempts common law actions. The New York Court of Appeals has observed, however, that the New York U.C.C. "has the objective of promoting certainty and predictability in commercial transactions." *Putnam Rolling Ladder Co. v. Mfrs. Hanover Trust Co.*, 74 N.Y.2d 340, 349 (1989) (noting as well that "the UCC not only guides commercial

-9-

behavior but also increases certainty in the marketplace and efficiency in dispute resolution"). Article 4 itself recognizes that "[t]he tremendous number of checks handled by banks and the country-wide nature of the collection process require uniformity in the law of bank collections." N.Y. U.C.C. § 4-101 cmt. We therefore hold -- as we did with Article 4A -- that Article 4 precludes common law claims that would impose liability inconsistent with the rights and liabilities expressly created by Article 4.[5]

Our holding gives effect to the terms of § 4-103(1), which provide that "the provisions of [Article 4] may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to

---

[5] Under New York law, we are permitted to certify to the New York Court of Appeals "determinative questions of New York law [that] are involved in a case pending before [us] for which no controlling precedent of the Court of Appeals exists." N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a); see also 2d Cir. R. 27.2(a) ("If state law permits, the court may certify a question of state law to that state's highest court."). We resort to certification "sparingly," however, *Highland Capital Mgmt. LP v. Schneider*, 460 F.3d 308, 316 (2d Cir. 2006), and recognize that certification is "not proper where the question does not present a complex issue, there is no split of authority and sufficient precedents exist for us to make a determination," *Tinelli v. Redl*, 199 F.3d 603, 606 n.5 (2d Cir. 1999) (quotation marks and brackets omitted). In the present case, we see no need to certify the Article 4 preemption question as the question before us falls well within the *Tinelli* guidelines.

-10-

exercise ordinary care." *Id.* § 4-103(1). This section would be rendered meaningless if common law claims could impose liability inconsistent with the rights and liabilities expressly created by Article 4. *See Sunshine v. Bankers Trust Co.*, 32 N.Y.2d 404, 410 (1974) (finding a purported agreement to extend a bank's time to charge back a depositor's account invalid because the bank "[was] attempting to disclaim its own responsibility for ordinary care" in violation of N.Y. U.C.C. § 4-103).

Here, as discussed below, however, the Agreements did not create rights or obligations inconsistent with those created by Articles 4 and 4-A. Accordingly, we hold that the district court correctly held that the common law breach of contract claim was not preempted and that it correctly looked to the Agreements to decide the rights and liabilities of the parties.

### b. *Analysis of the Claim*

Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Summary judgment is appropriate if the terms of the

contract are unambiguous. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).

The parties dispute only the third element, and the principal point of contention is the meaning of the term "available." The thrust of F&M's argument is that when Citibank's website "gratuitously" declared the funds to be "available" before they had been collected, it implicitly represented that the Check had cleared, thereby misleading F&M into believing that funds were "available for withdrawal as a matter of right" for both wire transfers. Citibank argues that "available" meant only that the account balance could be withdrawn from the account and not that the balance represented collected funds.

The district court correctly rejected F&M's interpretation and accepted Citibank's. The Agreements clearly show that while Citibank gave its customers the ability to make use of check proceeds provisionally, that is, before checks cleared, that right was subject to a charge back if a check was returned.[6] We hold, in the circumstances here, that "available"

---

[6]    F&M agreed to be bound "by all of the rules, regulations, charges and fees in the Citibank Client Manual and Schedule of Fees and Charges and any other account agreements it receives and any modification(s) or amendment(s) of the same."

meant only that account balances were "available" for use on a

provisional basis, subject to a charge back if a check was

returned, and not that the account balance represented collected

funds.

The key provision is contained in the Addendum, which

provides clear guidance as to the processing of checks:

> **When Does a Check Clear?:** This process
> begins when you deposit a check to your
> account and is not completed until the bank
> on which the check is drawn either honors or
> returns it to Citibank unpaid. Checks may be
> returned because of insufficient funds,
> missing signatures, stop payment orders, etc.
>
> The schedules in this addendum show when the
> majority of your check deposits will be made
> available to you. The schedules are based on
> the amount of time generally required for
> checks to clear and on federal and state
> regulations.
>
> Please note that a check you deposit may be
> returned unpaid after we have made the funds
> available to you. If this happens, the
> amount of the returned check will be deducted
> from your account balance.

(Emphasis added). The last-quoted paragraph plainly provides

that funds will be made "available" on a provisional basis,

subject to a charge back if a check is returned.

_____

Under the Manual, Citibank was entitled to set-off an overdraft
against other accounts of the customer, including, for example, a
money market account.

-13-

The unsurprising notion that customers are responsible for returned checks is reinforced by the Manual, which unambiguously provides:

> **Returned Checks:** If you deposit a check that is returned to us unpaid, we will deduct the amount of the returned check from your account balance and return the check to you. There will also be a service charge.

F&M makes two principal arguments to support its assertion that "available" is synonymous with "collected." First, it points to certain clauses in the Agreements that purportedly provide that only collected funds can constitute available funds. Second, it argues that the district court erroneously ignored controlling provisions of the U.C.C. Both arguments fail.

First, F&M makes much of a provision in the Manual, in a section listing exceptions to Citibank's "Standard Funds Availability Policy," that reserves to Citibank the right to "require that any check you present for deposit be sent out for collection." When this exception is invoked, Citibank will accept a check only on a "collection basis," that is, the funds are not made available until after payment is received from the bank on which the check is drawn. But this exception to Citibank's general policy of making funds provisionally available

-14-

was *not* invoked here, and thus it is not relevant. F&M also relies on other references in the Citibank documents to "sufficient" funds and "available" funds, but these references likewise do not stand for the proposition that Citibank's advice that funds were "sufficient" or "available" meant that they had been "collected" or "finally settled."[7]

Second, F&M's argument that the district court erroneously ignored provisions of the U.C.C. also fails, for the controlling agreements do not create rights and liabilities inconsistent with those under the U.C.C. F&M notes, for example, that § 4-213(4) provides that:

> credit given by a bank for an item in an account with its customer becomes available for withdrawal *as of right* (a) in any case where the bank has received a provisional settlement for the item, -- when such settlement becomes final and the bank has had a reasonable time to learn that the settlement is final.

---

[7] For example, the User Agreement instructs customers to give online instructions to make transfers or payments "only when a sufficient balance is, or will be, available in that account at the time of withdrawal." It also explains that "Citibank will not act on your CitiBusiness Online withdrawal instructions if sufficient funds are not available." Again, however, "sufficient" does not mean "collected." As Citibank permitted its customers to make use of funds on a provisional basis, as long as there was a "sufficient" balance of "available" funds, a customer could make use of them, subject to a charge back for returned checks.

-15-

N.Y. U.C.C. § 4-213(4) (emphasis added). F&M argues that because § 4-213(4) provides that funds are "available for withdrawal as of right" only when a "settlement becomes final," Citibank erred when it advised F&M that the funds were "available" before settlement of the Check became final. The obvious flaw with this argument is that Citibank did not advise F&M that the funds were "available for withdrawal *as of right*." Rather, Citibank advised only that the funds were "available," without representing that the Check had cleared or that the funds had been collected or that settlement had become final. "Available" is different from "available as of right."

In fact, the U.C.C. expressly recognizes that a bank may permit a customer to use funds provisionally, subject to a charge back in the event of dishonor, as § 4-212(1) provides:

> If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor . . . to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer.

N.Y. U.C.C. § 4-212(1).[8] By permitting its customers access to

---

[8]     *See also, e.g., Call v. Ellenville Nat'l Bank*, 5 A.D.3d 521, 524 (2d Dep't 2004) ("Accordingly, when final settlement was

-16-

funds on a provisional basis, subject to the right of a charge-back and refund, Citibank was merely following a practice that is common in the banking industry.[9]

Accordingly, we affirm the district court's dismissal of F&M's breach of contract claim.

## 2. *Negligence*

### a. *U.C.C. Preemption*

The district court correctly held that Article 4-A preempted any common law claims inconsistent with its provisions. As we held in *Grain Traders*, there is "no claim for negligence unless [the] conduct complained of was not in conformity with

_____

not made on the check by the payor bank due to discovery of the counterfeit, the defendant bank was entitled to revoke the provisional settlement made on the check and charge back [the depositor's] account or obtain a refund from [the depositor] for the funds drawn on the check."); *Chase v. Morgan Guarantee Trust Co.*, 590 F. Supp. 1137, 1138 (S.D.N.Y. 1984) ("[I]f the collecting bank has credited a customer's account for an item and even allowed the customer to make a provisional withdrawal, but fails to receive a final settlement for that item, it may charge back the customer's account.").

[9] "Under current bank practice, in a major portion of cases banks make provisional settlement for items when they are first received and then await subsequent determination of whether the item will be finally paid. . . . [I]n those cases where the item being collected is not finally paid . . . , provision is made for the reversal of the provisional settlements, charge-back of provisional credits and the right to obtain refund." N.Y. U.C.C. § 4-212 cmt. 1.

Article 4-A." 160 F.3d at 103; *see* N.Y. U.C.C. § 4-A-102 cmt.

(Article 4-A is designed to be the "exclusive means of

determining the rights, duties and liabilities of the affected

parties in any situation covered by particular provisions of the

Article").

b.   *Analysis of the Claim*

In its second claim, F&M argued that Citibank failed to

exercise reasonable care because it waited some fifteen hours to

try to cancel the two wire transactions after it was asked to do

so.   F&M contends that it asked Citibank at approximately 3:30

p.m. on January 21 to recall the two wire transactions, and that

Citibank made no effort to do so until 6:11 a.m. the next day,

January 22.   F&M contends that, at a minimum, genuine issues of

material fact existed as to whether Citibank acted reasonably by

not trying sooner.   The district court rejected the argument.   We

agree.

Under Article 4-A, a "payment order" is an instruction

by a "sender" to a "receiving bank" to pay (or to cause another

bank to pay) a sum of money (under certain conditions not

relevant here).   N.Y. U.C.C. § 4-A-103(1)(a).   "[A] communication

by the sender canceling or amending a payment order is effective

. . . if notice of the communication is received at a time and in

-18-

a manner affording the receiving bank a reasonable opportunity to act on the communication before the bank accepts the payment order." *Id.* § 4-A-211(2). The "receiving bank . . . accepts a payment order when it executes the order." *Id.* § 4-A-209(1). "A payment order is 'executed' by the receiving bank when it issues a payment order intended to carry out the payment order received by the bank." *Id.* § 4-A-301(1).

Here, F&M was the "sender" because it was "the person giving the instruction to the receiving bank," *id.* § 4-A-103(1)(e), that is, the instruction to recall, and Citibank was the "receiving bank" because it was "the bank to which the sender's instruction [was] addressed," *id.* § 4-A-103(d). F&M's instruction to recall the wire transfers, however, came too late, as the documentary evidence shows that Citibank had already executed both payment requests. Citibank executed the payment order for the first wire transfer at 7:51 a.m. on January 20 and for the second wire transfer at 9:37 a.m. on January 21, both well before F&M made its request to cancel at 3:30 p.m. on January 21. Hence, F&M's cancellation order was not effective, as it did not give Citibank "a reasonable opportunity to act on the communication before [it] accept[ed] [*i.e.*, executed] the payment order." *Id.* § 4-A-211(2); *see Aleo Int'l, Ltd. v.*

*Citibank, N.A.*, 160 Misc. 2d 950, 952 (Sup. Ct. N.Y. Cnty. 1994) (order to cancel wire transfer was ineffective where it was given five hours after receiving bank had already accepted payment order).

F&M argues that the district court misapplied Article 4-A because Citibank was not the "receiving bank" but the "sending bank." This argument fails. While it may be that Citibank *sent* F&M's cancellation orders by forwarding the requests to the Korean bank and BoA, it was not the "sender" within the meaning of § 4-A-211(2). In the circumstances here, the sender is the person who "want[s] to withdraw . . . the [payment] order because [he] has had a change of mind about the transaction or because the payment order was erroneously issued or for any other reason." N.Y. U.C.C. § 4-A-211 cmt. 1. F&M was the party that "had a change of mind about the transaction," and it addressed its instruction to Citibank, making Citibank the "receiving bank." *Id.* § 4-A-103(d).

F&M also argues that issues of fact existed as to whether the cancellation orders would have been effective if Citibank had acted more quickly, and challenges the documents showing that the payment orders were executed before the recall request was made. F&M does so, however, in a wholly conclusory

manner, and it is unable to point to any concrete evidence to contradict Citibank's documents showing that it executed the payment orders before the request to cancel was made. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (party opposing summary judgment cannot rely on "conclusory allegations or unsubstantiated speculation").

F&M cites documents showing that Citibank did not act on the recall request until 6:11 a.m. on January 22, but even assuming fifteen hours was too long, that delay was not the cause of F&M's injury. F&M also points to its monthly account statement, which showed that the second transfer was not debited to the account until January 22; the fact that the account was not debited until January 22, however, does not undermine the documentary evidence showing that the second payment order was executed the day before. Again, as the district court properly found, the critical question in terms of timing is when Citibank executed the wire transfer requests, as set forth in § 4-A-209(1).

We have considered F&M's remaining arguments and conclude that they lack merit.

## CONCLUSION

The judgment of the district court is AFFIRMED, with costs.